ESTATE OF RUSSELL HARRISON VARIAN, DECEASED, DOROTHY HILL VARIAN, EXECUTRIX, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 5330–63. Filed October 17, 1966.

*Paul E. Anderson*, *Valentine Brookes*, and *Barbara Ashley Phillips*, for the petitioner.

*David R. Brennan*, for the respondent.

TANNENWALD, *Judge:* The Commissioner determined a deficiency in estate tax in the amount of $1,476,958.71. The petition alleges that the tax was overpaid in the amount of $81,025.58.

Prior to trial of the case, the parties executed an agreement of partial settlement, under which they made various settlements, concessions, and agreements respecting several of the issues raised by the pleadings—with the result that the amount of tax in controversy has been substantially reduced. This agreement will be given effect in the recomputation of tax to be made under Rule 50.

The issues remaining for decision are:

(1) Whether three inter vivos transfers in trust which the decedent and his wife made for the benefit of decedent's three minor children are includable in the decedent's gross estate under sections 2036 and 2038, I.R.C. 1954, to the extent of decedent's half interest therein.

(2) If the above issue is decided in the affirmative, whether the amounts to be added to the decedent's gross estate should include certain stock dividends which were subsequently received by the trusts in respect of the stock originally transferred by the decedent.

(3) Whether that portion of the residuary bequest of the decedent, which was given in trust for concededly exempt purposes but was subject to a conditional power of invasion in the testamentary trustees for the benefit of the decedent's children up to $100,000, should be allowed as a charitable deduction.

Certain general findings of fact are hereinafter set forth. Additional separate findings of fact, together with opinions for each of the above issues that must be decided, are also set forth. All facts which

have been stipulated are so found, and those stipulated facts which pertain to a particular issue are incorporated by reference in the Findings of Fact for the issue to which they relate.

Petitioner is the Estate of Russell Harrison Varian, deceased, who died testate on July 28, 1959, a resident of Cupertino, Calif. The decedent's last will and testament was admitted to probate in the Superior Court of the State of California for the County of Santa Clara, and the decedent's wife, Dorothy Hill Varian, was duly appointed executrix and has at all times since acted as such. The Federal estate tax return for the estate was filed with the district director of internal revenue at San Francisco.

The decedent (hereinafter sometimes called Russell) was born on April 24, 1898; and at the time of his death he was 61 years of age. He had been married twice; and, at the time of his death, both his first wife, from whom he had been divorced, and also his second wife, who is the above-mentioned Dorothy Hill Varian (hereinafter called Dorothy), were living. He was survived also by the following children:

|  | Date of birth | Age at Russell's death |
|---|---|---|
|  |  | *Years* |
| George Russell Varian (son by prior marriage) | Apr. 22, 1943 | 16 |
| Charles John Varian (son adopted by decedent and wife Dorothy) | Jan. 28, 1950 | 9 |
| Susan Aileen Varian (daughter adopted by decedent and wife Dorothy) | Oct. 28, 1951 | 7 |

Russell was a physicist and an inventor of electronic equipment, who had attained widespread recognition and distinction in both capacities. At the time of his death he was chairman of the board of directors of Varian Associates, a California corporation engaged in the general field of electronics. Russell had organized this corporation in 1948, with only a small amount of capital, to develop and commercially utilize certain of his electronic inventions. The corporation thereafter experienced rapid growth and importance. At present, its shares of stock (now widely held by the public) are listed both on the New York Stock Exchange and on the Pacific Coast Stock Exchange.

Russell's most important invention was an electronic tube known as Klystron, which, together with other related Varian tubes, is the principal product of Varian Associates. The Klystron is a tube which enables electricity to oscillate several million cycles per second with such precision that it has become an exceptionally important factor for long-range communications, for radar in both military and civilian

aviation, and for transmission of television programs. For example, in a recent television broadcast, which was transmitted from Japan to the United States via the Syncom satellite, this tube was utilized both in transmitting and in receiving the program.

Russell and his wife Dorothy were both university graduates. Russell graduated from Stanford University in 1925; received a master's degree in physics from this university in 1927; served as a Research Associate at Stanford from 1934 to 1940; and in 1943 was awarded the honorary degree of Doctor of Engineering by Polytechnic Institute of Brooklyn, N.Y. Dorothy graduated from the University of California in 1928 and did graduate work there for 1 year as a teaching fellow in sales management and market analysis. The educational opportunities which both had thus enjoyed were one of the factors which motivated their creation of the trusts for the benefit of their children.

Russell and Dorothy each had an unusually clear understanding of economic problems and they worked closely with one another and with their attorney in handling their business and family affairs, including the making of plans for the future education of their children.

*Issue 1. Inter Vivos Transfers in Trust for the Benefit of the Children*

### FINDINGS OF FACT

Under date of March 30, 1955 (which was approximately 4 years prior to Russell's death), Russell and his wife created three identical trusts—one for the benefit of each of their three above-mentioned minor children Each trust was to be administered by them as trustees; and each was to continue in existence only until the child attained the age of 21 years or sooner died—at which time the trust estate was to be distributed absolutely to the child or to his or her estate or appointees under a general power of appointment. The ages of the children at the time these trusts were created were: George—11 years; Charles—5 years; and Susan—3 years.

At the same time, Russell and Dorothy transferred to each of these trusts 425 shares of the common stock of Varian Associates. These shares had been held by Russell and Dorothy as community property under the laws of California.[1] Consequently, only one-half of the shares constituted transfers by Russell. The value of the shares at that time was $20 per share, or $8,500 for the total number of shares given by both Russell and Dorothy to each trust. Thus, the value of the gifts

---

[1] Sec. 161(a) of the Civil Code of California provides, in material part, that the respective interests of the husband and wife in community property during continuance of the marriage relation are *present, existing, and equal interests* under the management and control of the husband. And the Supreme Court of California has held in *Siberell* v. *Siberell,* 214 Cal. 767, 7 P. 2d 1003 (1932), that the effect of this provision of the Civil Code was to invest the wife with full title to one-half of the community property, ceding to the husband only the management and control thereof.

attributable to the transfers made by Russell was $4,250 for each trust. The value of the stock held by each trust increased substantially prior to Russell's death in 1959.

The terms of all the three declarations of trust were identical, except for the name and description of the particular child, and were in pertinent part as follows:

RUSSELL H. VARIAN and DOROTHY H. VARIAN, hereinafter called "Trustees", hereby declare that RUSSELL H. VARIAN and DOROTHY H. VARIAN, as husband and wife, and as "Trustors", have individually transferred by gift to the Trustees, the following described property in trust for the uses and purposes set forth below:

1. *Trust Property.* The trust property consists of 425 shares of the no par value common stock of Varian Associates, a California corporation, receipt of which is hereby acknowledged by Trustees. All property now or hereafter subject to this trust shall constitute the trust estate, and shall be held, managed and distributed as hereinafter provided.

2. *Beneficiary.* The beneficiary of this trust is * * * [herein was inserted the name, relationship and date of birth of the particular child for whose benefit the particular trust was created].

3. *Distribution of Income and Principal.*

(a) The Trustees shall pay to or apply for the benefit of the child such sums as may in the Trustees discretion be necessary for the child's support, maintenance and education.

(b) In the discretion of Trustees, the principal and income or any portion thereof, may be payable to the child at any time before attaining the age of 21 years.

(c) To the extent not so expended the remainder shall pass to and shall be distributed by Trustees to the child on attaining the age of 21 years.

(d) In the event the child dies before attaining the age of 21 years, the trust property and the income therefrom shall be payable to the estate of the child, or as he may appoint under a general power of appointment.

4. *Powers of the Trustees.* To carry out the purposes of this trust, the Trustees are vested with the following powers, in addition to any now or hereafter conferred by law, affecting the trust and the trust estate:

(a) through (e) [These paragraphs set forth broad powers relating to the holding, management, and administration of the trust estate.]

(f) To determine what is principal or income of the trust estate and apportion and allocate in their discretion receipts and expenses as between these accounts. Except insofar as the Trustees shall exercise this discretion, matters relating to principal and income shall be governed by the provisions of the Principal and Income Act from time to time existing.

(g) The enumeration of certain powers of the Trustees shall not limit their general powers, the Trustees, subject always to the discharge of their fiduciary obligations, being vested with and having all the rights, powers and privileges which an absolute owner of the same property would have.

5. *Additional Property.* The Trustors shall have the right at any time to add to this trust other property, which shall become a part of the trust estate.

6. *Spendthrift Clause.* The interest of the beneficiary in principal or income shall not be subject to claims of creditors or others, nor to legal process, and may not be voluntarily or involuntarily alienated or encumbered.

On April 26, 1955 (which was 27 days after the dates of the creation of the trusts), Russell and Dorothy executed three other instruments—one for each trust. The provisions were likewise identical except for reference to the particular trust involved as follows:

RUSSELL H. VARIAN and DOROTHY H. VARIAN, as "Trustees" and as "Trustors" under that certain Declaration of Trust executed March 30, 1955, and acknowledged before a Notary Public today, hereby state:

1. *Trust Irrevocable.* It was our intention at the time of creation of this trust on March 30, 1955, that it was an outright gift to our son, and irrevocable under the common law of the United States.

2. *Express Declaration.* In order to comply with the Amendment to Section 2280 of the Civil Code of the State of California, we hereby amend the instrument creating the trust to express our original intention that the trust is expressly made irrevocable.

IN WITNESS WHEREOF, we have amended the instrument creating the trust freely and voluntarily this 26th day of April, 1955.

The trusts become irrevocable under the law of California as of April 26, 1955.[2]

Russell and Dorothy were moved to create each of the three trusts by their desires that their children have some assets of their own which would insure the future completion of college or university educations consistent with their abilities and thereby provide a basis for the children's independent careers; and that the children might in the future have a source of funds with which to build homes. Russell felt very strongly that a person should own his own home if possible. On the other hand, Russell and Dorothy did not want the amounts of their gifts to be too large, so that the children might feel that they were "wealthy people's children," instead of being self-reliant. Thus, they selected, as the subject of their transfers to the trusts, shares of stock of Varian Associates which Russell had founded and with which they were both familiar—even though they knew that no cash dividend had been paid on this stock since the corporation was organized in 1948 and that, by reason of the corporation's very rapid growth and need for capital expansion, there was no expectation that any such dividend would be paid on said stock in the foreseeable future.

Following the creation of the trusts, Russell filed a U.S. Gift Tax return for the year 1955; and Dorothy executed the consent embodied therein, under which she agreed that each of the above-mentioned gifts should be considered as having been made one-half by each of them. Each of the gifts in trust was reported as a gift of a present interest

---

[2] The courts of California have held that, where a gift in trust was not originally declared to be irrevocable, the donor may thereafter cause the same to become irrevocable under sec. 2280 of the Civil Code of that State, "by some unequivocal act or declaration." *Brucks* v. *Home Federal Sav. & Loan Ass'n.,* 36 Cal. 2d 845, 228 P. 2d 545 (1951); and *Evinger* v. *MacDougall,* 28 Cal. App. 2d 175, 82 P. 2d 194 (1938).

(as distinguished from a future interest) for which the $3,000 exclusion from taxable gifts was claimed; and the value of each joint gift was stated to be $8,500. The gift tax as shown on the return was fully paid and the gift tax return was accepted without adjustment by the Internal Revenue Service.

From the time of the creation of each of these trusts until Russell's death, Russell and Dorothy were the trustees. After Russell's death, Dorothy was the sole trustee.

None of the trusts derived any income up to the time of Russell's death. Accordingly, no Federal income tax return was filed on behalf of any of them during that period. However, each of the trusts did receive certain nontaxable stock dividends from Varian Associates during that period, which were held by the trustees as trust principal.

Up to the time of Russell's death, no amount of income or principal was paid out of any of the trusts, either to or for the benefit of any beneficiary or otherwise.

Throughout that period, all amounts which were expended by or on behalf of each of said children for their support, maintenance, education, or otherwise were paid by Russell out of his own personal funds.

Also throughout that period, all of said trusts continued to exist in a relatively dormant condition, except for the receipt of stock dividends.

None of the transfers in trust was made in contemplation of death.

In the estate tax return, the amount of the gross estate was reported to be approximately $3,500,000. Of this amount, approximately $2,900,000 (representing the residue of the estate as computed in the return) was claimed as a deduction for a charitable gift in trust for public and charitable purposes. The three gifts in trust for the benefit of the children were reported as being completed and irrevocable gifts for the year 1955, in respect of which a gift tax return had been duly filed and the gift tax paid; and all of these gifts were declared to be, and were treated as being, *not* includable as part of the decedent's gross estate.

In the respondent's notice of deficiency, one of the determinations was that the three inter vivos transfers by trust which the decedent had made for the benefit of his three minor children were includable in his gross estate under sections 2036 and 2038, I.R.C. 1954.

OPINION

Are the three transfers in trust by the decedent during his lifetime for the benefit of his three minor children includable in his gross estate under sections 2036 and 2038, I.R.C. 1954? The pertinent

provisions of these two sections of the Code are set forth in the margin.[3]

If the question involved herein were one of first impression, it might have been possible to sustain petitioner's position under section 2038. At most, the power retained by the decedent permitted him merely to shift principal and income between the life beneficiary and the latter's estate. If the trust property were allowed to pass, it would be the life beneficiary who would, if he died before the age of 21, control the persons to whom the property would devolve, either by executing a will or a general power of appointment (if he were legally capable of executing one) or by dying intestate. It could be argued that such a limited power in a decedent is not a "power * * * to * * * terminate" within the meaning of section 2038(a)(1). See A.L.I. Federal Income, Estate and Gift Tax Statute 191 (Tent. Draft No. 10, 1955). The decision of the Supreme Court in *Commissioner* v. *Estate of Holmes*, 326 U.S. 480 (1946), does not, on its facts, reject such an argument for the reason that there the takers in default were named in the trust instrument so that the decedent's exercise of the power to advance payment constituted a direct selection by the decedent himself.

The difficulty is that in *Lober* v. *United States*, 346 U.S. 335 (1953), the Supreme Court faced the issue that might be said to have been left open by *Estate of Holmes* and held directly against the position taken by the petitioner herein. In *Lober*, the decedent established separate trusts with himself as trustee for the benefit of each of his three children. The income, in the discretion of the decedent-trustee, was to be accumulated or distributed to each beneficiary until he attained the age of 21, after which the accumulated and current income was to be paid to the beneficiary. Upon attainment of the age of 25, the principal was to be paid to the beneficiary. The decedent-trustee was given the discretion at any time prior to the time fixed for distribution to

---

[3] SEC. 2036. TRANSFERS WITH RETAINED LIFE ESTATE.

(a) GENERAL RULE.—The value of the gross estate shall include the value of all property (except real property situated outside of the United States) to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death—

(1) the possession or enjoyment of, or the right to the income from, the property, or

(2) the right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property or the income therefrom.

SEC. 2038. REVOCABLE TRANSFERS.

(a) IN GENERAL.—The value of the gross estate shall include the value of all property (except real property situated outside of the United States)—

(1) TRANSFERS AFTER JUNE 22, 1936.—To the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, where the enjoyment thereof was subject at the date of his death to any change through the exercise of a power (in whatever capacity exercisable) by the decedent alone or by the decedent in conjunction with any other person (without regard to when or from what source the decedent acquired such power), to alter, amend, revoke, or terminate * * *

pay over all or any part of the principal to the beneficiary. The trust instrument made no provision for a gift over in the event that a beneficiary died prior to reaching 25. The Supreme Court expressly assumed, however, that the trust instrument gave the beneficiaries "a 'vested interest' under state law, so that if they had died after creation of the trusts *their interests would have passed* to their estates." (Emphasis added.) See 346 U.S. at 336. Nevertheless, despite argument that this factor was a critical distinction from the situation in *Estate of Holmes* (see pet. br. 24) and a decision sustaining such a distinction (*Hays' Estate* v. *Commissioner*, 181 F. 2d 169 (C.A. 5, 1950)), which was the basis for the grant of certiorari, the Supreme Court held that the trusts were included in the decedent's gross estate under section 811(d)(2) of the Internal Revenue Code of 1939, the predecessor of section 2038(a)(1).[4] In so doing, the Court stated (346 U.S. at 337):

The trust instrument here gave none of Lober's children full "enjoyment" of the trust property whether it "vested" in them or not. To get this full enjoyment they had to wait until they reached the age of twenty-five unless their father gave them the money and stocks by terminating the trust under the power of change he kept to the very date of his death. This father could have given property to his children without reserving in himself any power to change the terms as to the date his gift would be wholly effective, but he did not.

See also *Struthers* v. *Kelm*, 218 F. 2d 810 (C.A. 8, 1955) ; cf. *Estate of John J. Round*, 40 T.C. 970 (1963), affd. 332 F. 2d 590 (C.A. 1, 1964) ; *Estate of Carrie Grossman*, 27 T.C. 707 (1957) ; *Estate of Cyrus C. Yawkey*, 12 T.C. 1164 (1949).

Petitioner attempts to distinguish *Lober* on the ground that the power of decedent therein was exercisable after each beneficiary came of age. We consider this is a distinction without a difference. None of the subsequent cases has ever suggested that *Lober* might be thus avoided. And in *Lober* itself, all three children were in fact minors at the time of decedent's death.[5] Nevertheless, all three trusts were held includable in the gross estate under the predecessor of section 2038(a). In *Lober*, the power in question was vested in the trustee and could not be presently exercised *in futuro*. In other words, decedent's power to distribute principal after a beneficiary attained his majority was contingent upon the decedent still being trustee. It has long been settled that an includable power must exist at the date of death and that the existence of a future contingent power is insufficient. E.g., *Helvering* v. *M. Tetzlaff*, 141 F. 2d 8 (C.A. 8, 1944), affirming 1 T.C. 1216 (1943) ; see *Estate of Frederick M. Kasch*, 30

---

[4] Actually sec. 811(d)(2) was the predecessor of sec. 2038(a)(2) but, except for their applicability to transfers prior to and after June 22, 1936, subsecs. (d)(1) and (d)(2) of sec. 811 and subsecs. (a)(1) and (a)(2) of sec. 2038 are the same.

[5] The record on appeal in the Supreme Court shows that one child was born on Jan. 11, 1922, and two on Feb. 7, 1929. (See petition in the U.S. Court of Claims, par. 9.) Death occurred in 1942.

T.C. 102, 108 (1958), and cases cited therein. The rationale of *Lober* must therefore rest on the existence of a present power exercisable during minority, rather than a future contingent power to terminate exercisable after majority.

Nor does the reversal of our decision in *Estate of Jack F. Chrysler*, 44 T.C. 55 (1965), revd. 361 F. 2d 508 (C.A. 2, 1966), help petitioner's case. That reversal was grounded on a holding that the property was already the property of decedent's daughter at the time the custodian arrangements were established. The Court of Appeals expressly stated that it was unnecessary to decide whether sections 2036 or 2038 applied. See 361 F. 2d at 511.

The instant case involves not only a power in the trustees (the decedent and his wife) to use the trusts for "support, maintenance and education" but also an absolute power to pay principal and income to the life beneficiary. Certainly the latter completely unrestricted power cannot possibly be held to be a "true fiduciary power," as suggested by the petitioner, or otherwise subject to some external standard which would limit its exercise. Cf. *Jennings* v. *Smith*, 161 F. 2d 74 (C.A. 2, 1947); *Estate of Frederick M. Kasch, supra.* Apparently petitioner seeks first to imply, from the facts relating to the decedent's financial ability and intention to provide for his children from his own funds, a prohibition on the use of the trust funds which would limit the express and unlimited power granted in the trust instruments. Petitioner then draws the further inference that the California courts would sustain such an implied prohibition and enforce it in the circumstances of this case. We have found no decisions of the California courts which support such a bootstrapping process. Petitioner's references to the alleged limitations of California law on the powers of the trustees herein are therefore unavailing. Nor is the provision of the California Code (Cal. Prob. Code sec. 1430) governing payments to a guardian rather than to the minor himself also relied on by petitioner in any way material to the issue involved herein. This provision and *Pollock* v. *Industrial Accident Commission*, 5 Cal. 2d 205, 54 P. 2d 695 (1936)—cited by petitioner—do not establish substantive restrictions against payment to a minor; they merely provide a procedure for assuring that a payment will discharge the payor's obligation to the minor.

Finally, the fact that Congress conferred limited gift tax benefits on trusts of the type involved herein, through the enactment of section 2503,[6] in no way justifies, as petitioner suggests, the conclusion that the legislature intended to exclude such trusts from the estate tax. Indeed, the contrary position could be asserted by noting that, when

---

[6] Sec. 2503 is not an exemption from gift tax; it merely extends the annual exclusion to the type of trust involved herein.

Congress wanted to exclude the instant type of power as a determinant of the taxability of trust income to the donor, it did so specifically. Sec. 674(b) (6) and (7). Nor is it significant that practically all of the States have enacted the Uniform Gifts to Minors Act. Surely, State action cannot be indicative of legislative intent for purposes of the Federal estate tax.

Albeit reluctantly, we see no escape from the fact that under the standards prescribed by *Lober*, the enjoyment of the trust property was subject to change through the exercise by decedent of a power to terminate. All of the facts and circumstances as to the background and intentions of decedent and his wife cannot obscure this basic condition. We hold that the three trusts are includable under section 2038(a) (1) to the extent of the transfers by the decedent.

Under these circumstances there is no need to consider the applicability of section 2036. It should be noted, however, that the California cases, involving support and maintenance and relied upon by the petitioner, deal with restrictions upon the right of a parent to use funds *owned outright* by the minor or to seek reimbursement by way of compelling *a third party* to exercise his discretion with respect to funds held for the benefit of the minor. It does not necessarily follow that the same restrictions would apply where, as here, the instrument governing the distribution of the funds *expressly authorizes such use and the parents-settlors are the trustees*. Cf. *Struthers* v. *Kelm*, *supra; Helfrich's Estate* v. *Commissioner*, 143 F. 2d 43 (C.A. 7, 1944) ; note, 121 A.L.R. 176, 197–201.

## *Issue 2. Stock Dividends*

### FINDINGS OF FACT

To the extent applicable, the findings of fact as to issue 1 are incorporated herein by reference.

During Russell's life, the number of shares in each child's trust was augmented by two transactions. On June 16, 1955, Varian Associates exchanged 10 shares of $1 par value common stock for each share of no-par-value common stock held by a stockholder. Each child's trust received 4,250 shares of $1 par value common stock in exchange for its 425 shares of no-par-value common stock. On June 1, 1959, Varian Associates declared a 100-percent stock dividend to its share holders. Each child's trust received 4,250 shares of $1 par value common stock as a dividend on its existing stock. On the date of Russell's death, each child's trust held 8,500 shares of common stock of Varian Associates. The common stock of Varian Associates was, and is now, listed on the New York and Pacific Coast Stock Exchanges. Its fair market value on Russell's death was $36.25 per share.

In the 4-year period from the date of the creation of the trusts to Russell's death, Varian Associates issued 1,560,643 shares of $1 par

value common stock to its stockholders. Of the total shares issued, 1,012,620 shares were issued on June 16, 1955, in exchange for 101,262 shares of no-par stock. The remaining 548,023 shares were issued in subsequent transactions consisting of the conversion of debentures and preferred stock, the sales of stock to employees and to the public, and the acquisition of a subsidiary. Varian Associates reflected the payments received for the stock issued in two accounts on its books entitled "Common Stock—par value $1" and "Capital in Excess of Par Value of Common Stock." The amount of each payment made for each share was credited to the "Common Stock—par value $1" account to the extent of the aggregate par value of the stock issued for the payment and the excess was credited to the "Capital in Excess of Par Value of Common Stock" account.

At the time the stock dividend was declared on June 1, 1959, the balance in the "Capital in Excess of Par Value of Common Stock" account was $4,384,796. The entire amount of the aggregate par value of the stock dividend was charged on Varian's books against the "Capital in Excess of Par Value of Common Stock" account. This entry resulted in transferring $1,560,643 from the "Capital in Excess of Par Value of Common Stock" account to the "Common Stock—par value $1" account. After the stock dividend, the "Common Stock—par value $1" account reflected a balance of $3,121,286 and the "Capital in Excess of Par Value of Common Stock" account was reduced to a balance of $2,824,153.

Of the $4,384,796 balance in the "Capital in Excess of Par Value of Common Stock" account on June 1, 1959, just before the stock dividend was declared, $481,875 was in existence both on June 16, 1955, at the time the no-par value stock was converted into $1 par value stock, and also prior to the date of the original transfers to each trust. The balance of the "Capital in Excess of Par Value of Common Stock" account came into existence during the period between June 16, 1955, and the date of Russell's death. The ratio of $481,875 to $4,384,796 is 10.99 percent and the ratio of $3,902,921 to $4,384,796 is 89.01 percent.

OPINION

Having decided that the trusts herein should be included in the decedent's gross estate, it becomes necessary to consider the measure of the inclusion. The principal of the trusts included: (1) The shares of Varian initially transferred by the decedent in March 1955; (2) shares resulting from a stock split in June 1955; and (3) a 100-percent stock dividend issued in June 1959. Petitioner concedes that the measure of inclusion should encompass (1) and (2) and that portion of (3) representing capital surplus as it existed in 1955. He contends, however, that the 1959 stock dividend was declared out of capital surplus

and that the portion representing such surplus acquired after June 1955 should not be includable. This case was heard and briefs filed prior to the Supreme Court's decision in *United States* v. *O'Malley*, 383 U.S. 627 (1966). In that case, the decedent established a trust in which the trustees, of which decedent was one, were given the power to distribute income currently or to accumulate the income and add it to principal. The trust received cash dividends during the period from its establishment to the decedent's death and exercised its discretion to add such dividends to principal. The Supreme Court rejected the taxpayer's argument that, to the extent of such cash dividends, decedent had not made a "transfer" and consequently the amount represented by the dividends was not includable in the gross estate. In so doing, the Court stated (383 U.S. at 632–633):

All income increments to trust principal are therefore traceable to * * * [decedent] himself, by virtue of the original transfer and the exercise of the power to accumulate. * * * the power over income retained by * * * [decedent] is sufficient to require the inclusion of the original corpus of the trust in his gross estate. The accumulated income added to principal is subject to the same power and is likewise includable. [Citations omitted.]

We think *O'Malley* controls the instant case. We recognize that the cash dividends in *O'Malley* were received as income and then added to principal while in the instant case presumably the stock dividends were part of principal from the outset. But the decision of the Supreme Court turned not on the character of the property, but on the existence of a power in the decedent to dispose of the property. Since, under *Lober*, the decedent herein had the power to dispose of the entire 1959 stock dividend by either distributing it or retaining it in the trust, *O'Malley* requires that the entire dividend without apportionment be included in his gross estate—limited, of course, to the stock dividend in respect of the shares originally transferred by the decedent.

*Issue 3. Deductibility of Portion of Residual Bequest for Charitable Purposes*

FINDINGS OF FACT

To the extent applicable, the findings of fact with respect to issues 1 and 2 are incorporated herein by reference. In his last will and testament the decedent, after making provision for various expenses and claims, and also for certain small specific bequests of which none was for any of his above-mentioned children, bequeathed the residue of his estate in trust to five trustees, primarily for public and charitable purposes but subject to the following provision contained in article 10 (g) of the will:

(g) *Emergency Provision for the Benefit of Our Children.*—Our children have heretofore been provided for under the terms of rather large, separate, living

trusts. It is anticipated that such trusts will provide our children with sufficient funds to meet all the usual and normal needs of education and the financial needs of acquiring a home and beginning their respective careers. While it is not anticipated that our children will be burdened with catastrophic expenses relative to accident or illness, such contingency is possible. Accordingly, I authorize Trustees to pay to or apply for the benefit of our children, or any of them, so much of the income of this trust as Trustees may determine proper or necessary to provide any of the childern with reasonable care or support in case of such illness or accident. I also authorize Trustees to augment the separate income from the trusts established for our children to the extent that Trustees may consider necessary for the education and support of the children during the period they are acquiring their college and university educations, including graduate and advanced studies. The sum thus to be available for their education and care shall not exceed a total of $100,000.00 for all of them.

The petitioner, in the estate tax return, claimed a charitable deduction of $2,992,501.87 in respect of the residuary bequest.

The respondent disallowed the entire amount of the claimed charitable deduction, on the ground that the residual bequest was not exclusively for charitable purposes. However, prior to the trial of this case, the respondent in the agreement of partial settlement—

(1) *Expressly conceded* that petitioner is entitled to a charitable deduction by reason of the above-mentioned residual bequest, "in the amount of at least $2,972,147.16, reduced by the amount of federal estate taxes finally determined to be due in this proceeding"; and

(2) *Further agreed* that "whether or not petitioner is entitled to a charitable deduction of an additional $100,000 [representing the maximum amount by which the residual bequest might possibly be invaded under the above-quoted par. (g) of art. 10 of the decedent's will] is in issue between the parties."

At Russell's death each of the living trusts for the benefit of the three children had a value in excess of $300,000. At that time, Russell's wife was approximately 50 years of age. She owned assets in her own right having a value of approximately $3 million.

During the taxable years 1960 through 1963, each of the trusts received cash by way of interest and the proceeds from the sale of stock rights as follows:

| Year | Interest | Proceeds of sale |
|---|---|---|
| 1960 | $78.62 | $6,988.14 |
| 1961 [1] | 485.60 | 8,107.72 |
| 1962 [1] | 684.98 | 0 |
| 1963 [1] | 697.92 | 0 |

[1] Due to distributions to son George in 1961 and 1962, the interest figures for the trust for his benefit for the years 1961 through 1963 are $481.66, $643.62, and $545.85, respectively.

Son George was the beneficiary of a $5,000 trust and a $200 monthly allowance as a result of Russell's divorce from his first wife.

The possibility of invasion of the charitable trust to the extent of $100,000 was not so remote as to be negligible.

OPINION

The sole question before us is: Should the amount of the deduction for the bequest for charitable purposes, as conceded by respondent, be increased by $100,000? To resolve this question we are required to make two determinations: (1) Whether the will herein contains a reasonable standard for determining the extent to which the charities might be deprived of the trust funds;[7] and (2) whether *in fact* the possibility of invasion under the standard is so remote as to be negligible. *Merchants Bank* v. *Commissioner*, 320 U.S. 256 (1943); *Ithaca Trust Co.* v. *United States*, 279 U.S. 151 (1929); *Estate of Mary Cotton Wood*, 39 T.C. 919 (1963); *Estate of Oliver Lee*, 28 T.C. 1259 (1957); sec. 20.2055–2(b), Estate Tax Regs.

We think that the provisions of paragraph (g) of article 10 of the decedent's will clearly set forth a reasonable standard. We reach this conclusion on the basis of the plain language of the instrument and therefore find it unnecessary to resolve the fine points of the parol evidence rule as applied to testimony relating to the decedent's intention, which have engaged the attention of the parties. Paragraph (g) is labeled an "emergency provision"; it refers to the fact that the children have otherwise been provided for through living trusts (those discussed under issues 1 and 2) and that it is anticipated that the trusts will provide them with sufficient funds to meet "all the usual and normal needs of education and the financial needs of acquiring a home and beginning their respective careers"; it ties the use of the income of the charitable trust to unanticipated catastrophic expenses relative to accident or illness; its direction to augment the income from the living trusts is limited to amounts considered by the trustees as necessary for "the education and support of the children during the period they are acquiring their college and university educations, including graduate and advanced studies."

The second condition—whether the possibility that the charitable trust will be used for the benefit of the children is so remote as to be negligible—presents greater difficulty.

We think it significant that all the children were young at the decedent's death (16, 9, and 7 years) and that there is no limitation on

---

[7] As we read the applicable provision of the will, the right of the trustees to expend funds for noncharitable purposes is limited to income. The parties have, however, dealt with this issue, both in the stipulation of facts and on argument, as though the trustees of the charitable trust had a power of invasion of principal to the extent of $100,000. We therefore do not consider whether our reading of the provision would, in and of itself, make any difference in determining the extent to which the $100,000 should be allowed as a charitable deduction.

the period during which they could look to the charitable trust for assistance. The trust funds could presumably be used for medical expenses throughout the children's lives and educational expenses included not only "graduate" but "advanced" studies. We further note that, although the children came from a family with a simple background and therefore may have had modest and sensible concepts of standards of living at the time of decedent's death, there could be no assurance that this situation would continue after they came of age and received the distributions from the living trusts.[8] If any of them were to run through the funds thus distributed to them and then incur substantial medical expenses, the trustees of the charitable trust could well be called upon to exercise their power of invasion.

At the decedent's death, there were three potential sources of funds to which the children could look. First, Russell's wife was a woman of substantial means and we accept at face value her testimony that she would do the necessary to maintain all three children with the result that we need not delve into the question whether the California law required her to do so. The difficulty lies in the fact that she is mortal and her death could come at any time. Granted that early death is usually remote in one's expectations, it nevertheless cannot be considered a factually negligible possibility. Second, although it is true that the living trusts might be available, the principal asset of these trusts was Varian stock. Even though each trust was worth over $300,000 at the decedent's death, the evidence shows that no cash dividends had ever been paid on the Varian stock and that during the years 1960 through 1963, aside from annual interest received of less than $700 and a realization of approximately $14,500 from two isolated sales of Varian stock rights in 1960 and 1961, these trusts were devoid of cash assets. Concededly, some of the Varian stock might be sold but, under the circumstances of this case, we are not prepared to assume that such a step would be taken other than reluctantly. Nor can we find that another $5,000 trust in which the oldest son had a beneficial interest and a $200 monthly court-awarded living allowance incident to Russell's divorce from his first wife provided a significant source of funds. Third, the children could look to the charitable trust to the extent of $100,000 for medical and education expenses. The great bulk of this trust was represented by Varian stock which presumably would be as limited a source of funds as the living trusts.[9] We have not been apprised of the manner in which the

---

[8] At the time of trial son George had reached 21 and the trust for his benefit had been terminated.

[9] The vagaries arising from the fact that the principal assets of the three living trusts and the charitable trusts consisted of Varian stock are revealed by the evidence that the value of Varian stock was $36¼ per share at decedent's death but only $14⅝ at the time of trial.

charitable trust was funded but an examination of Russell's estate tax return shows that he died possessed, among other things, of income-producing royalty contracts valued at $500,000 and approximately $50,000 in cash. In view of the fact that Russell's specific bequests were nominal and that the debts and administration expenses as shown on the estate tax return aggregated only slightly more than $200,000,[10] it seems likely that these income-producing assets found their way into the charitable trust and would therefore be a ready potential source of funds for the children.

While we recognize that three of the five trustees of the charitable trust testified that they would construe paragraph (g) as authorizing the use of the charitable trust funds only as a last resort, we observe that such post-death statements obviously have a self-serving aura. We think that it would deny human nature to accept without question the proposition that the income-producing funds of the charitable trust would not be the most likely source out of the total availabilities for providing for the children's education and medical expenses, particularly if decedent's widow should die.[11] Moreover, we note that a less strict attitude might well be adopted by a successor trustee. See *Price* v. *Rothensies*, 67 F. Supp. 591, 596 (E.D. Pa. 1946).

We see no purpose to be served in analyzing the decided cases, many of which fall on either side of what at times seems to be a shadowy line. While the issue herein is not entirely free of doubt, we are constrained to hold, on balance, that the possibility of the use of the funds of the charitable trust under paragraph (g) is not so remote as to be negligible and therefore justifiably disregarded. Cf. *Estate of Abraham Buckwalter*, 46 T.C. 805 (1966).

We therefore decide issue 3 in favor of the respondent.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

PIERCE, *J.*, dissenting: I was the trial judge in this case and am the only member of our Court who saw and heard the witnesses testify. Based on my familiarity with the case, I think the Court has approached the problems herein from too narrow and unrealistic a

---

[10] The estate tax resulting from inclusion of the three living trusts, in accordance with our decisions under issues 1 and 2, will result in a taxable estate on which an estate tax will be payable. In view of the adjustments to be made and the interplay of the marital and charitable deductions, we are unable to calculate the exact amount of the estate tax. It would appear, however, that, assuming that any such tax would in fact be paid out of these assets, approximately $200,000 in *income-producing assets would still find their* way into the charitable trust.

[11] Although petitioner argues that theoretically it should make no difference that the total charitable trust had a value far in excess of $100,000, the thought has not escaped us that the trustees would be more likely to accede to pressures to use the funds for the benefit of the children than they would if the total trust funds were only $100,000.

viewpoint; and that its decisions on issues 1 and 3 are erroneous. As regards issue 2, I point out that if the Court had decided issue 1 in favor of the petitioner (as I believe it should have done) it would not have reached or had to decide issue 2, which appears to involve a possible extension of principles approved by the Supreme Court in *United States* v. *O'Malley*, 383 U.S. 627 (decided Mar. 23, 1966), reversing the decision of the Seventh Circuit at 340 F. 2d 930.

## I. *Re Issue 1*

1. The basis of the Court's opinion as to issue 1 is that it regards the decision in *Lober* v. *United States*, 346 U.S. 335 (1953) to be, in effect, an insuperable obstruction to reaching an opposite result. As the Court frankly stated, it applied "Albeit reluctantly" what it considered to be standards prescribed by *Lober;* and it also stated that, "If the question herein were one of first impression, it might have been possible to sustain the petitioner's position under section 2038 [1954 Code]."

In my view *Lober* presents no such obstruction to attaining the contrary result which the Court indicated that it might otherwise have reached. I believe that *Lober* is here distinguishable on its facts, and is therefore inapplicable. The Court, as I have hereinabove suggested, appears to have approached the case from too narrow and unrealistic a viewpoint, and thus has failed to perceive that the transactions here considered simply effected: (a) The making of fully completed, closed, and irrevocable gifts of shares of corporate stock by parents to their minor children; and (b) the concurrent creation of custodian-type trusts which, by reason of the underage legal disabilities of the children, were necessary for the preservation, management, and administration of the gift properties until such disabilities would be eliminated by the children's attainment of their majorities.

In such circumstance I would have applied the principles which were applied by the Court of Appeals for the Second Circuit in its recent opinion in *Estate of J. F. Chrysler* v. *Commissioner*, 361 F. 2d 508 (1966), reversing the decision of this Court in 44 T.C. 55 (1965). In that case the Court of Appeals decided: That the decedent therein had relinquished to his children all beneficial interest in the gift property, without reserving either a life estate or the power to terminate or alter the enjoyment thereof; that he could not thereafter increase his powers over the property previously transferred, without the consent of the children; and hence, that it was not necessary to resolve questions pertaining to the applicability of sections 2036 and 2038, of the 1954 Code. The *Lober* case, which involved application of a statute cognate to the last-mentioned section, was cited in the Govern-

ment's brief filed with the Second Circuit in the *Chrysler* case, but was not even mentioned in that Court's opinion.

2. The following comparison of the transactions involved in the present *Varian* case and in the *Lober* case, reveals the distinction between these cases.

(A) In the instant *Varian* case, the Court's findings of fact show that in 1955 the decedent and his wife decided to make a gift to each of their three minor children (whose ages were then, 11 years, 5 years, and 4 years, respectively). The gifts consisted of 425 shares of stock in the Varian Associates corporation which the decedent had founded. They were of modest value ($8,500 in the case of each child) because the parents wished to prevent the children from getting an idea that they were "wealthy people's children," instead of being self-reliant. The parents hoped that this stock, in which they had confidence but on which no dividends were expected to be paid in the foreseeable future, would appreciate in value, so as to assure the children of university educations consistent with their abilities; and that with such assistance, the children would be able to establish satisfying careers.

The actions of the parents in furtherance of this plan met all requirements for complete and irrevocable gifts, i.e.: The parents intended (and they formally stated in sworn statements executed for the purpose of meeting requirements of California law) that the gifts were "outright" and "irrevocable"; the stock was transferred, as has been stipulated; and acceptance of the gifts (which is presumed where donees are minors and the gifts are for their benefit) was formally made by the parents in their capacities as trustees of the custodian-type trusts that were concurrently created to hold the property for the children during their underage legal disabilities.

With further regard to the children's trusts, these were, in reality simply devises for administering property of minors without going through the cumbersome and expensive process of creating and operating guardianships which otherwise would have been necessary. Even if the stock here involved had been acquired by the children from grandparents through inheritances, instead of through gifts from their parents, either custodian-type trusts or guardianships would have been required under California law, since the value of the property was in excess of that which the local law permitted minors to receive directly. See Cal. Prob. Code secs. 1400, 1430; *Pollack* v. *Industrial Accident Commission*, 5 Cal. 2d 205, 54 P. 2d 695, 697–698.

The powers granted to the trustees under the declarations of trust were fiduciary in character. They are similar to powers which are commonly employed in minors' trusts; they are identical with the powers which Congress incorporated in the new provisions of section 2503(c) of the 1954 Code for the purpose of indicating those powers

under which transfers to minors would be recognized as present interests (as distinguished from "future interests") for gift tax purposes. Said powers also were similar, and indeed less broad, than those selected for use in making gifts in accordance with the Uniform Gifts for Minors Act, which was approved in 1956 by both the National Conference of Commissioners on Uniform State Laws and also by the American Bar Association, and of which counterparts have now been adopted by nearly all the States, and by Congress on behalf of the District of Columbia. See 9B Uniform Laws Ann. 174, and 1965 cum. ann. part 62–63. The inclusion in all such powers, of discretionary authority for the fiduciary to distribute income or principal for a minor beneficiary's benefit, is necessary for protection of the minor in the event of unforeseeable catastrophes (such as loss of support through death of both parents in a common accident) that might make it necessary for the fiduciary to resort to the minor beneficiary's own property.

It is well settled that transfers of interests in property and the character of interests in trusts, are governed by State law as distinguished from Federal law. The Supreme Court said in *Helvering* v. *Stuart*, 317 U.S. 154, 161–162:

Grantees under deeds, wills and trusts, alike, take according to the rule of the state law. * * * Congress has selected an event, that is the receipt or distributions of trust funds by or to a grantor, normally brought about by local law, and has directed a tax to be levied if that event may occur. Whether that event may or may not occur depends upon the interpretation placed upon the terms of the instrument by state law. Once rights are obtained by local law, whatever they may be called, these rights are subject to the federal definition of taxability. Recently in dealing with the estate tax levied upon the value of property passing under a general power, we said that "state law creates legal interests and rights. The federal revenue acts designate what interests or rights, so created, shall be taxed." * * *

To the same effect see *Blair* v. *Commissioner*, 300 U.S. 5, 9; and see also statements in *Commissioner* v. *Stern*, 357 U.S. 39.

Under the local law of California, the decedent herein and his wife, while acting as trustees of the custodian-type trusts, could not have applied the children's trust property in discharge of their parent-obligations to support the children, so long as they were able to adequately meet such obligations. *Ex parte Carboni*, 46 Cal. App. 2d 605, 116 P. 2d 453, 457; *In re Keck*, 100 Cal. App. 513, 280 P. 387; and *Fagan* v. *Fagan*, 43 Cal. App. 2d 189, 110 P. 2d 520, 525. See also to the same effect: *In re Ceas' Estate*, 134 Cal. 114, 66 P. 187; and Cal. Prob. Code sec. 1504. In the instant case, the evidence establishes conclusively that the decedent was able to, and did, adequately perform his duty to support and educate all his children at all times; and hence, section 2036 (a) (1) of the Code is not here applicable.

Even if Varian and his wife had decided (improbable as it would have been) to distribute all the trust properties to the children prior to their attaining majority, California law would have required that property of such substantial value be delivered not to the children directly, but to guardians appointed to receive the same. In such event, the result would have been a mere shifting of the property from one fiduciary to another, without effecting any change in "the enjoyment thereof" within the meaning of section 2038 of the Code. As was pointed out by the Supreme Court in the *Lober* case, *supra*, and also in *Commissioner* v. *Estate of Holmes*, 326 U.S. 480, 486—so long as property of a child is being administered for him by a fiduciary (there a trustee), the child has no "present right to immediate enjoyment" of either the income or principal.

Finally, in the instant case the death of Varian did not effect any change in property rights of either the donors or the donees; nor did it effect any change in the powers granted to the fiduciaries under the declarations of trust involved. Furthermore, each of the three trusts had only a single beneficiary, whose identity at the time of the decedent's death was not subject to change. Also, the time when the property of each trust would become distributable under the terms of the declarations of trust, was definitely fixed and not subject to change. Thus, keeping in mind that the Federal estate tax is an excise on the transfer of property from the dead to the living, and on the extinguishment of interests or powers held by the decedent, it becomes clear that none of the provisions of the Federal estate tax law is here applicable.

(B) Considering next the transactions in the *Lober* case, none of the trusts therein created was a custodian-type trust under which property of a minor was to be administered solely during his underage legal disability. Rather, each of the *Lober* trusts was to continue until the beneficiary reached the age of 25 years which was 4 years after he would attain majority—unless Lober elected to exercise his retained power to change the date on which the trust property would become distributable. Said trusts were, in substance, two-stage trusts. The first stage thereof was to continue until the beneficiary attained his majority, at and after which time the trust income but not the principal was to be distributed to him; and then the second stage would commence, during which only the trust principal would continue to be held in trust for the adult beneficiary, until he attained the age of 25 years—unless as before stated, the decedent elected to shorten such period. Thus, Lober did not intend at the time he created the trusts in 1929, to relinquish all his control over the trust property. Rather he retained substantial powers that would have enabled him during the second stage to hold onto the "purse strings" of the trust property;

and which would have empowered him, either to distribute the trust property to the adult beneficiaries for their *full present enjoyment*— to use, spend, waste, or invest as they might desire; or on the other hand to elect, if the adult beneficiaries did not act or live in a manner which suited him, to continue the trusts until the beneficiaries attained their respective ages of 25 years. Under the latter situation the adult beneficiaries would have been deprived of their full present enjoyment of the property.

It was this second stage of the *Lober* trusts to which the Supreme Court appears to have given principal consideration in its decision; for the Court said:

The Lober beneficiaries, like the Holmes beneficiaries, were granted no "present right to immediate enjoyment of either income or principal." * * * To get this full enjoyment they had to wait until they reached the age of twenty-five unless their father sooner gave them the money and stocks by terminating the trust under the power of change he kept to the very date of his death. * * * What we said in the *Holmes* case fits this situation too: "A donor who keeps *so strong a hold* over the actual and immediate enjoyment of what he puts beyond his own power to retake has not divested himself of *that degree of control* which * * * [the estate tax statute] requires in order to avoid the tax." [Emphasis supplied.]

Based on all the foregoing, I would have held with respect to issue 1, as hereinbefore suggested: That the *Lober* case is here distinguishable; and that neither the provisions of section 2036 of the Code, nor the provisions of section 2038 which is cognate to an earlier statute to which the *Lober* case pertained, is here applicable. I would have decided issue 1 in favor of the petitioners, in accordance with the rationale of the Second Circuit's opinion in the above-cited *Chrysler* case.

## II. *Re Issue 3*

I think the Court's decision as to issue 3 is unrealistic. Realizing that this issue is largely one of fact, and that in such situation importance usually is attached to the views of the trial judge, I deem it appropriate to here again state that I was the trial judge in this case and am the only member of the Court who saw and heard the witnesses testify. Therefore, I also deem it appropriate to point out some of the principal factors established by the evidence, which cause me to feel that a contrary decision should have been made as to this issue.

Both this Court and others have previously decided cases involving a similar question, i.e.: Whether or not the possibility of invasion of a charitable bequest is sufficiently remote to justify such possibility being disregarded. See, for example, *Estate of Mary Cotton Wood*,

39 T.C. 919; *Estate of Oliver Lee*, 28 T.C. 1259; and *Ithaca Trust Co.* v. *United States*, 279 U.S. 159. In dealing with such a question, I feel that the approach to the problem must be reasonable and realistic, and not overly pessimistic; for otherwise, if too much emphasis is placed on all the catastrophes, physical and mental illnesses, and financial misfortunes that could beset the person for whose benefit the invasion might be made, it seems likely that in no such case would the claimed charitable deduction be allowed. Thus, in resolving such a question it is essential that all factors revealed by the evidence which bear upon the reasonable possibility of the charitable bequest being invaded, must be very carefully considered and weighed.

In the instant case, I regarded the testimony of all the witnesses to be highly credible. I do not agree with the Court's suggestion that the testimony of the trustees of the charitable trust should be viewed as obviously having "a self serving aura"; and its further suggestion that "the trustees would be more likely to accede to pressures to use the [charitable] funds for the benefit of the children." To the contrary, I think the trustees testified with the higher motive of trying to be frank and helpful to the Court in expressing their views with respect to a situation with which they were especially well acquainted. I would have accorded substantial weight to the trustees' testimony, including their opinions that the possibility of invasion was remote.

Also, I would have given no weight to the fact that paragraph (g) of article 10 of the decedent's last will, is labeled "Emergency Provision." The evidence indicates that such provision had been carried over from a prior will of the decedent which had been executed at an earlier time when the value of the assets of the children's trusts was considerably less, and when such provision then seemed to be appropriate. The evidence also establishes that at the time when decedent's attorney was preparing the draft of the last will here involved, decedent expressed the opinion that, because the value of the stock held under the children's trusts had appreciated beyond his expectations, he thought the so-called Emergency Provision was no longer necessary. He thereupon definitely instructed the attorney to delete the same from the draft of the new will; but he was thereafter persuaded, though reluctantly and contrary to his expressed views, to permit said "Emergency Provision" to remain in his last will and testament. Viewed in this setting I think the "Emergency Provision" should be dealt with cautiously; for otherwise an unjust result might flow from the action of a layman in being overconcerned for the welfare of his children.

Furthermore, I think that the Court in considering only "three potential sources of funds to which the children could look," inadvertently overlooked what I regard to be the most important potential

source of all, to wit: The future earnings of the children from the careers for which they were being prepared and educated. Most parents would reasonably expect, I believe, that such future earnings of children so reared and educated, would be the principal source for their meeting necessary future needs.

The situation here presented, and the factors which I think justify a different decision on the present issue, are these: The Varian family, notwithstanding the parents' wealth, had a simple background, as the Court has found, and it maintained a modest standard of living. It thus is reasonable to anticipate that the children, whom the decedent had strived to prevent from acquiring any idea that they were "wealthy people's children," would continue to maintain in the future, this same modest and sensible standard of living. The children were all healthy; were enrolled in good schools; and were expected to obtain, with their mother's assistance, university educations which would make them self-reliant and enable them to establish satisfying careers of their own. Also the parents, in furtherance of assuring fulfillment of their plan, had established the inter vivos trusts for their children. The corpus of each of these trusts consisted of listed stock of Varian Associates, a corporation that had enjoyed phenomenal success and could reasonably be expected to be successful in the future. This stock, at the time of decedent's death, was being managed for the children under custodian-type trusts, and was to be distributed to the children upon their attaining majority. The value of the stock in each trust at the time of decedent's death, was more than $300,000.

An additional factor to be considered is the situation regarding the charitable trust. The evidence shows that this trust was viewed with great pride and interest by both the decedent and his wife; and the testimony of three of the five trustees was to the effect that they would resist any invasion of the trust for the children's benefit.

Viewing the situation as a whole, as reasonably and realistically as I can, I think that most prudent persons including those who are parents, would be astounded by any suggestion that the Varian children—who were healthy normal children, who were being reared and educated with an objective of having them provide for themselves, and who in addition had each been funded with a "nest egg" of over $300,000—would not be able to take care of their future needs without reaching into the funds of the charitable trust.

I would have held, in deciding issue 3, that the possibility of invasion of the charitable trust for the children's benefit is so remote as to be negligible. Therefore, I would have decided issue 3 in favor of the petitioners.

FORRESTER and FAY, *J.J.*, agree with this dissent solely as to issue 3.