ESTATE OF MARVIN L. PARDEE, DECEASED, JAMES I. McCLINTOCK AND NATIONAL BANK OF DETROIT, COEXECUTORS, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 7249–65.   Filed December 1, 1967.

*Charles D. Savage*, for the petitioners.
*Charles S. Stroad*, for the respondent.

142

## OPINION

Respondent relies upon Code sections 2036(a)(1), 2036(a)(2),[2] and 2038(a)(1)[3] to support the inclusion of the Pardee Trust in the decedent's gross estate. Respondent contends that the entire corpus and accumulated income[4] would be includable under sections 2038(a) (1) and 2036(a)(2), but concedes that only a portion of the trust assets, as explained below, would be includable under section 2036(a) (1). We have concluded that respondent is in error as to sections 2038(a)(1) and 2036(a)(2) but is correct as to section 2036(a)(1).

Under section 2038(a)(1), retention of a power by a grantor-trustee to pay out or retain corpus and income does not lead to inclusion of the trust in the gross estate where the trustee is held to an objective standard of conduct in the exercise of the power. *Jennings* v. *Smith*, 161 F. 2d 74 (C.A. 2, 1947). Respondent concedes the correctness of this rule but contends that the trustee's power here to invade "so much of the corpus of said Trust as in the discretion of said Trustee shall be necessary for the education, maintenance, medical expenses, or other needs

[2] SEC. 2036. TRANSFERS WITH RETAINED LIFE ESTATE.

(a) GENERAL RULE.—The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death—

    (1) the possession or enjoyment of, or the right to the income from, the property or

    (2) the right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property, or the income therefrom.

[3] SEC. 2038. REVOCABLE TRANSFERS.

(a) IN GENERAL.—The value of the gross estate shall include the value of all property—

    (1) TRANSFERS AFTER JUNE 22, 1936.—To the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, where the enjoyment thereof was subject at the date of his death to any change through the exercise of a power (in whatever capacity exercisable) by the decedent alone or by the decedent in conjunction with any other person (without regard to when or from what source the decedent acquired such power), to alter, amend, revoke, or terminate, or where any such power is relinquished in contemplation of decedent's death.

[4] See *United States* v. *O'Malley*, 383 U.S. 627 (1966), on the inclusion of the accumulated income.

of the Beneficiaries occasioned by emergency" is so broad as to negate an objective standard and to give the trustee power to terminate the trust through corpus and income distributions. Specifically, respondent contends that the language "other needs * * * occasioned by emergency" is fatal to petitioner's case.[5]

Deciding whether a power is so broad as to permit termination of a trust or is subject to judicially enforceable, objective standards requires, of course, an interpretation of the trust indenture. In the interpretation of a trust indenture it is imperative that a phrase, such as "other needs * * * occasioned by emergency," here relied upon by the respondent, not be taken out of context because its meaning may be affected by the words it accompanies. See *United States* v. *Powell*, 307 F. 2d 821, 826 (C.A. 10, 1962). Observing this imperative, the trustee's powers in the Pardee Trust clearly were not absolute or uncontrolled but were limited by objective standards.

There can be no doubt that an appropriate court of the State of Michigan in the exercise of its equity jurisdiction would have little difficulty in enforcing the beneficiaries' rights to income and corpus "necessary" for "education," "maintenance" or "medical expenses." Indeed, the Michigan Supreme Court has noted that "It is one of the particular duties of a court of chancery to look after the interests of minors, and it may, if necessary, permit the anticipation of, or advancement from, a trust fund, that will eventually go to them, in order to provide for their education and support." *Post* v. *Grand Rapids Trust Co.*, 255 Mich. 436, 238 N.W. 206, 207 (1931). The use of "other needs" following the words "education, maintenance," and "medical expenses" shows that the kind of "needs" referred to were needs similar to those specifically described. The trustee was, moreover, restricted by the requirement that distributions could be made only "in equal shares to the Beneficiaries." And, finally, "The fact that the same discretion was expressly given to any succeeding trustee, however appointed, is an additional indication, if any is needed to make it clear, that there was no intention to give an uncontrolled discretion to the trustee." *Viall* v. *Rhode Island Hospital Trust Co.*, 45 R.I. 432, 123 Atl. 570, 572 (1924).

Respondent cites *Michigan Trust Co.* v. *Kavanagh*, 284 F. 2d 502 (C.A. 6, 1960); *Estate of Russell Harrison Varian*, 47 T.C. 34 (1966), on appeal (C.A. 9, Feb. 6, 1967); and *Estate of John J. Round*, 40 T.C. 970 (1963), affd. 332 F. 2d 590 (C.A. 1, 1964), to support his

---

[5] Par. 4(c)(i) of the trust indenture, concerning corpus invasions, contains the above-quoted language, while par. 4(c)(ii), establishing the standard for income distributions, uses the language "any other needs * * * occasioned by emergency." On brief, respondent's argument was addressed solely to par. 4(c)(i), and he did not contend that these provisions should be treated differently. In any event, we believe our reasoning is applicable to both provisions.

argument that the use of the word "emergency" gave the trustee uncontrolled discretion. But these cases involved grants of powers where there was no specific language to add meaning to the general term. Thus in *Michigan Trust Co.*, the standard was "should what the Trustee deems a special emergency arise," and the court noted that this gave the trustee "unbridled discretion" in that "The alleged limitation furnished no guide as to what constituted a 'special emergency.'" 284 F. 2d at 505, 506. *Estate of John J. Round, supra*, involved a power to invade principal "in case of emergency" without other limiting language and was decided on the basis of *Michigan Trust*. In *Estate of Russell H. Varian, supra*, the trust established the standard of "support, maintenance and education" but then a *separate section* of the trust added the power to pay out principal and income "in the discretion" of the grantor-trustees. In order to give this section meaning it had to be read separately, and as a separate power it was clearly unlimited by any external standard.

A comparison of two other decisions highlights this distinction. In *Hurd* v. *Commissioner*, 160 F. 2d 610 (C.A. 1, 1947), affirming 6 T.C. 819 (1946), the trustees were empowered to invade corpus "if in their opinion the circumstances require." As the court correctly concluded, "The word 'circumstances,' as used in the trust instrument, is as wide as the world and to say that it imposes a legal limitation * * * is to stretch it far beyond good sense." 160 F. 2d at 612–613. Yet, in *Estate of C. Dudley Wilson*, 13 T.C. 869 (1949), affirmed per curiam 187 F. 2d 145 (C.A. 3, 1951), this Court found a sufficient external standard in a power to invade corpus "in case of need for educational purposes or because of illness or for any other good reason." Surely it cannot be argued that "for any other good reason" is more specific than "circumstances." Yet, because the first portion of the grant used definite terms which a court of equity could utilize in interpreting the whole provision, a sufficient standard was found.

In other cases objective standards for the exercise of a power have been found even though trust indenture language referred to an emergency. In *Estate of Milton J. Budlong*, 7 T.C. 756 (1946), reversed on another issue sub nom. *Industrial Trust Co.* v. *Commissioner*, 165 F. 2d 142 (C.A. 1, 1947), the trust indenture empowered the grantor-trustee to expend corpus for benefit of income beneficiaries "in case of sickness or other emergency." This Court held that the standard was enforceable by a court of equity (7 T.C. at 762) : "Clearly, the decedent did not have free rein to expend the corpus or to give it to whom he chose. In our opinion, the discretionary power to use corpus for the benefit of one not the grantor, in case of sickness or other

emergency, may not be distorted into a device to alter, amend, or revoke." [6]

We conclude that the exercise of these powers of decedent was controlled by objective standards and that section 2038(a)(1) does not apply.

Respondent next contends that the grantor-trustee's powers "to determine the division and divide the Trust Estate and to allocate receipts and expenditures between income and principal accounts" were in essence retained powers "to designate the persons who shall possess or enjoy the property or the income therefrom" within section 2036(a)(2).[7] The argument is that petitioner could allocate all receipts to principal or all expenditures to income and thus the beneficiaries could enjoy the trust benefits only if they survived until the trust terminated. If this were in fact the case, the respondent might well be correct that section 2036(a)(2) would apply. But since we do not believe the trustee had such an unlimited power, this need not be determined.

The trustee's power "to determine the division and divide the Trust Estate" was clearly intended to facilitate termination of the trust and the distribution of its assets in accordance with the prescribed formula. Obviously, this power was not intended to be used to override the carefully drawn limitations in paragraphs 4(c)(i) and (ii) of the trust indenture on corpus and income distributions for education, maintenance, medical, and other expenses which were designed to assure almost precisely equal distributions to the beneficiaries. Similarly the power "to allocate receipts and expenditures between income and principal accounts," we believe, was intended merely to give the trustee some discretion so that he would not be required to seek court guidance in making doubtful allocations or run personal liability risks. It was a power which was to be exercised reasonably and in good faith, subject to equity court review for an abuse of discretion. See *Caroline Gove Doty*, 3 T.C. 1013 (1944), affd. 148 F. 2d 503 (C.A. 1, 1945). There is nothing in the trust instrument or in the practical interpretation given it by the trustee to suggest that this provision was intended to permit the trustee arbitrarily to refuse to make income distributions to the beneficiaries so that the beneficiaries could enjoy the trust benefits only if they survived until the trust terminated. Such

---

[6] See also the cases under Code sec. 2055 or its predecessors, where the issue was whether the standard for invasion of the trust corpus was so fixed as to permit a present valuation of the charitable gift: *Lincoln Rochester Trust Co.* v. *McGowan*, 217 F. 2d 287 (C.A. 2, 1954) ("any unusual demands, emergencies, requirements or expenses for * * * personal needs that may arise from time to time" necessitated by "emergencies arising from sickness, accident or failure of investments") ; *Estate of Horace G. Wetherill*, 4 T.C. 678 (1945), appeal dismissed 150 F. 2d 1019 (C.A. 9, 1945) ("extraordinary expenses caused by an emergency created by her injury, illness, or disability") ; *Estate of James M. Schoonmaker, Jr.*, 6 T.C. 404 (1946) ("any illness, accident or other emergency or to provide for the proper maintenance, support, comfort and well-being of such beneficiaries").

[7] See fn. 2, *supra*.

an interpretation, moreover, is inconsistent with the apparent purposes of the trust. See *Frances Carroll Brown*, 30 T.C. 831, 835–836 (1958).

The reasons for including such a clause are obvious. The settlor has three choices: (1) He may make no provision and leave the decision on specific receipts to State law; (2) he may attempt to anticipate all types of possible receipts and provide for them; or (3) he may leave the decision to the controlled discretion of the trustee. The first choice places the trustee at his peril, for where the State law is uncertain he must make the correct decision or face personal liability. See Bogert, *Trusts and Trustees*, sec. 816 (2d ed.).[8] The second choice introduces a rigidity in the instrument which is generally undesirable and may lead to difficulties in classification of receipts. The third choice provides flexibility without uncontrolled discretion. See *Commissioner* v. *O'Keeffe*, 118 F. 2d 639, 642 (C.A. 1, 1941).

Respondent places heavy reliance on *State Street Trust Co.* v. *United States*, 263 F. 2d 635 (C.A. 1, 1959). But in *State Street* the court said at page 638:

It is true that it is not at all unusual to clothe trustees with power to invest trust assets in securities other than so-called "legals." And it is also true that it is far from uncommon to provide that trustees shall have the power in their discretion to allocate accretions to the property they hold in trust to principal or to income, at least when there is no settled rule of law to apply and proper allocation is open to honest doubt. Certainly in the exercise of one or both of these powers trustees can to some extent affect the interests of the various beneficiaries. Indeed, even in a trust wherein investment is limited to "legals," a trustee can effect some shifting of benefits between life beneficiaries and remaindermen by his choice of investment with respect to rate of income return or growth potential. But we would hardly suppose that in the ordinary case inclusion of one or both of the above provisions in a trust instrument would be a crucial factor in deciding whether or not the corpus of the trust should be included in a decedent's estate.

In *State Street* it was a combination of broad powers, and exculpation of the trustee except for "wilful acts or defaults" that led to inclusion in the settlor-trustee's estate. Cf. *Estate of Willard V. King*, 37 T.C. 973 (1962).

Respondent's final contention on the includability of the Pardee Trust is that a portion of the trust property is includable in decedent's estate under Code section 2036(a)(1)[9] and Estate Tax Regs. section 20.2036–1(b)(2)[10] because the decedent retained the power to utilize

---

[8] It should be noted that at the time this trust was created a Michigan trustee did not have the Revised Uniform Principal and Income Act to rely upon. This is no longer the case. See Mich. Stat. Ann. sec. 26.79, *et seq.* (Supp. 1965) (effective Jan. 1, 1966).

[9] See fn. 2, *supra*.

[10] Sec. 20.2036–1 Transfers with retained life estate.

(b)(2). The "use possession, right to the income, or other enjoyment of the transferred property" is considered as having been retained by or reserved to the decedent to the extent that the use, possession, right to the income, or other enjoyment is to be applied toward the discharge of a legal obligation of the decedent, or otherwise for his pecuniary benefit. The term "legal obligation" includes a legal obligation to support a dependent during the decedent's lifetime.

the trust to satisfy his legal obligation to support his minor children, citing *Commissioner* v. *Dwight's Estate*, 205 F. 2d 298 (C.A. 2, 1953), reversing 17 T.C. 1317 (1952), certiorari denied 346 U.S. 871 (1953). We believe that the respondent's position is correct.

Although the trust indenture recites that "the creation of this Trust is not intended by him [the decedent] to discharge any legal obligation," these precatory words, as noted above, were followed by words empowering the decedent as trustee to pay out corpus and income for the "education, maintenance, medical expenses, or other needs of the Beneficiaries occasioned by emergency." The separation agreement, signed by the decedent and incorporated in the divorce decree, declared that "The Husband may, in his sole discretion, discharge the obligations * * * [for support of the children] by payment of income or principal from that certain trust created December 31, 1948, by the Husband as Grantor and as Trustee for the benefit of the children of the parties hereto." This practical interpretation of the trust instrument shows that decedent understood the trust indenture to empower him to use trust funds for the support of his children. A settlor's acts are of great significance in construing a trust instrument. *Helfrich's Estate* v. *Commissioner*, 143 F. 2d 43, 46 (C.A. 7, 1944), affirming 1 T.C. 590 (1943).

Petitioner recognizes that if the income of a trust created by a decedent is used to discharge a legal obligation of the decedent during his life he will be held to have retained enjoyment of the income. Nevertheless, petitioner seeks to avoid inclusion of the trust on the ground that it is stipulated no payments were actually made from the trust to satisfy the decedent's obligation to support his wife and children with the exception of a $500 payment on June 17, 1960, to send William Gardner Pardee to the Lost Trail Camp.[11] But section 2036(a)(1) refers not only to the possession or enjoyment of property but also to "right to the income" from property. The section does not require that the transferor pull the "string" or even intend to pull the string on the transferred property; it only requires that the string exist. See *McNichol's Estate* v. *Commissioner*, 265 F. 2d 667, 671 (C.A. 3, 1959), affirming 29 T.C. 1179 (1958), certiorari denied 361 U.S. 829 (1959) ; cf. *Estate of Robert Manning McKeon*, 25 T.C. 697, 704 (1956). Since the decedent as trustee had the right to use

---

[11] On brief, respondent argues that trust distributions which were used for birthday gifts, Mother's Day gifts and Christmas gifts for the children's mother must be considered as falling within the obligation of the decedent to support his children as "The ability to bestow such tokens of affection contribute [sic] to a sense of well being and security—factors which are necessary for the children's character and personality development." While the characterization of these payments might be relevant to a question of income taxation, see Code sec. 677(b), we fail to see how it is relevant to the issue of estate tax. In any event, the parties have stipulated that only the payment of summer camp expenses fell within the decedent's *legal* obligation as determined by the divorce decree. See Rule 31(b)(6), Tax Court Rules of Practice.

the income to discharge his legal obligation to support his minor children, his retained interest falls within section 2036(a)(1).

There remains the difficult question of determining the amount to be included in decedent's gross estate by reason of the operation of section 2036(a)(1). We are aided to some extent by a concession by respondent that the full amount of the trust is not includable under this section and a suggestion that not less than the amount of corpus necessary to produce the monthly income required to satisfy decedent's obligation under the provisions of the separation agreement incorporated in the divorce decree should be included, citing *In re Uhl's Estate*, 241 F. 2d 867 (C.A. 7, 1957), reversing on other grounds 25 T.C. 22 (1955). Resolution of the question as to the precise amount includable, however, involves a close reading of both the statute and the divorce decree.

The purpose of section 2036 is to impose an estate tax with respect to property which a decedent transferred during his life but in which he retained the right to economic benefit until his death. *First National Bank of Shreveport* v. *United States*, 342 F. 2d 415, 416–417 (C.A. 5, 1965) (per curiam); *Greene* v. *United States*, 237 F. 2d 848, 852 (C.A. 7, 1956). Where the rights of the beneficiaries are delayed by the interposition of the grantor's interest, the section contemplates that all property subject to the decedent's beneficial interest (less preceding present beneficial interests) shall be included in the grantor's estate. However, where it is clear that the grantor's interest is of a limited nature, only that portion of the property necessary to satisfy this interest is included. Sec. 20.2036–1(a)(ii), Estate Tax Regs. Thus, we must first determine the amount of decedent's interest, and then decide how much of the trust was necessary to satisfy this interest.

The keystone of our decision that part of the Pardee Trust is includable in petitioner's estate was the retention of the right to satisfy the "legal obligation" of the decedent to his children. We think it clear that State law determines the extent of decedent's legal obligation. In this case, the separation agreement incorporated in the divorce decree provided that decedent was obligated to pay as support the sum of $250 per month for each child under 18.[12] As a general rule a judicial decree obligating a father to pay a certain sum as support is the limit on his liability. 24 Am. Jur. 2d, Divorce and Separations, sec. 835. While no Michigan cases have been found, it appears that Michigan would follow this rule. Mich. Stat. Ann. sec. 25.97 provides that requests for modification of a support award contained in a divorce decree shall be by petition to the divorce court, and it has been held that that court has exclusive jurisdiction. *Pierce* v. *Pierce*, 324

---

[12] While there was also a possible obligation to pay in excess of this amount while a child was away at school or summer camp, this contingency never occurred, and we do not believe the remote possibility should affect the computation.

Mich. 38, 36 N.W. 2d 205 (1949). Since the power to use additional funds of the trust was dependent upon a contingency beyond decedent's control which did not in fact occur, we find that the legal obligation of the decedent under Michigan law was only the obligation to pay $250 per month for each child under 18. Cf. *Daisy Christine Patterson, Executrix,* 36 B.T.A. 407 (1937), appeal dismissed 99 F. 2d 1007 (C.A. 10, 1938). However, at the time of his death, one of his children, Martha, was over 18, and decedent's obligation under the decree had terminated. Thus, the right retained "for any period which does not in fact end before his death" under section 2036(a) (1) was the right to satisfy his legal obligation of $500 per month for the two children under 18, and so much of the corpus necessary to generate this amount is includable in his gross estate. See *Townsend, Executor v. Thompson,* an unreported case (E.D. Ark. 1950, 42 A.F.T.R. 1309, 50–2 U.S.T.C. par. 10,780) ; *Estate of Robert Manning McKeon,* 25 T.C. 697 (1956).

Since petitioner has not shown that the 3½-percent return factor of the regulations is so unreasonable and unrealistic that some other factor should be used, see *Estate of Mary Fownes Tomec,* 40 T.C. 134 (1963) ; *Estate of Irma E. Green,* 22 T.C. 728 (1954), we conclude that the amount includable in the decedent's estate is the amount which is required to yield monthly payments of $500 per month at 3½ percent, or $171,428.57.[13] *United States Nat. Bank of Portland v. United States,* 188 F. Supp. 332, 340 (D. Oreg. 1960).

Petitioner deducted $2,269.44 from decedent's gross estate for 1962 real property taxes paid on property included in the gross estate. Petitioner here contends that the real property taxes accrued by operation of law on December 31, 1961, before decedent's death on March 7, 1962. Respondent contends that such taxes did not accrue until December 1, 1962, when they became a lien on decedent's property. We have concluded that the petitioner is correct.

Code section 2053[14] allows a deduction for property taxes as a claim against the estate subject to the limitation that "property taxes

---

[13] Consideration has been given to the possibility of limiting the inclusion to the computable amount of the corpus which would have been required to support the decedent's minor children until they reached 18 or to purchase an annuity for this purpose. But petitioner has advanced no such alternative contention and the fact is that he retained the right to use only the income for this purpose for a period which did not in fact end before his death.

[14] SEC. 2053. EXPENSES, INDEBTEDNESS, AND TAXES.

(a) GENERAL RULE.—For purposes of the tax imposed by section 2001, the value of the taxable estate shall be determined by deducting from the value of the gross estate such amounts—

(1) for funeral expenses,

(2) for administration expenses,

(3) for claims against the estate, and

(4) for unpaid mortgages on, or any indebtedness in respect of, property where the value of the decedent's interest therein, undiminished by such mortgage or indebtedness, is included in the value of the gross estate, as are allowable by the laws of the jurisdic-

not accrued" before the decedent's death shall not be deductible. Estate Tax Regs. section 20.2053–6(b) explains the test for determining whether property taxes have "accrued" under section 2053 as follows:

Property taxes are not deductible unless they accrued before the decedent's death. However, they are not deductible merely because they have accrued in an accounting sense. Property taxes in order to be deductible must be an enforceable obligation of the decedent at the time of his death.

The language, "in order to be deductible must be an enforceable obligation of the decedent at the time of his death," is similar to the normal test of deductibility for "claims against the estate." It obviously does not mean that such taxes must be due and payable; it includes matured as well as unmatured obligations. See sec. 20.2053–4, Estate Tax Regs. Whether property taxes have accrued depends upon their status under State law on the date of decedent's death.

Michigan property taxes are based on a calendar year. The "taxable status" of persons and real property for the following year is determined as of "tax day," which is December 31. Mich. Stat. Ann. sec. 7.2. "Tax day" is the crucial date. "Notwithstanding any provisions in the charter of any city or village to the contrary," real property taxes become a "debt due to" the taxing authority "from the owner or person otherwise to be assessed" on the "tax day." *Id.* sec. 7.81. The assessment rolls are presented to boards of review on Tuesday next following the first Monday in March, but it is specifically provided that the rolls shall be reviewed "according to the facts existing on the tax day" and that the boards shall not add to the rolls any property not subject to taxation on tax day nor shall it remove any property subject to taxation on that day regardless of any change in the taxable status of such property since such day. *Id.* sec. 7.29. The tax rate is established not later than the first Monday in June. *Id.* sec. 7.76. The amounts so assessed become a lien on such property on December 1 following "tax day." *Id.* sec. 7.81.

Except in limited circumstances, Michigan does not provide for a personal judgment for delinquent real property taxes. The State is not limited, however, to sale of the land for the collection of delinquent taxes. "Taxes on real estate may be collected by distress on goods and chattels * * * but if not so collected the tax is returned unpaid and the land sold to make it." *Schaefer* v. *Woodmere Ceme-*

---

tion, whether within or without the United States, under which the estate is being administered.

\*   \*   \*   \*   \*   \*   \*

(c) Limitations.—

 (1) Limitations applicable to subsections (a) and (b).—

 \*   \*   ·  \*   \*   \*   \*   \*

  (B) Certain taxes.—Any income taxes on income received after the death of the decedent, or property taxes not accrued before his death, or any estate, succession, legacy, or inheritance taxes, shall not be deductible under this section.

*tery Association*, 256 Mich. 332, 239 N.W. 300, 301 (1931) ; see *Gulf Refining Co.* v. *Perry*, 303 Mich. 487, 6 N.W. 2d 756, 757 (1942); *Gilken Corp.* v. *Commissioner*, 176 F. 2d 141, 144 (C.A. 6, 1949), affirming 10 T.C. 445 (1948) ; *Ernest Kern Co.*, 1 T.C. 249, 273–274 (1942).

Thus, when decedent died on March 7, 1962, the 1962 real property taxes here in question, under the precise words of the statute, had already become debts due from him to the respective taxing authorities. The statutory lien added nothing to his liability to the State; it merely provided a vehicle for one of two collection remedies. As between decedent and the State, "the necessary effect and direct result of the system itself" made the taxes a lien on the land in the sense that the State could, if necessary, sell the land to collect the tax; there was "no other purpose" for the lien provision of section 7.81 of the Michigan statutes, relied upon by the respondent, than to settle the question, as between successive owners of the land themselves, which of them ought to pay the tax in the absence of a controlling contract. *Harrington* v. *Hillard*, 27 Mich. 271, 276–277, 278 (1873) ; 1939–1940 Mich. Atty. Gen. Biennial Rept. 502 (May 17, 1940). The attorney general of Michigan has ruled that prior to the lien date the tax is a "debt" which is "unsecured." Op. Atty. Gen. Mich. No. 4463 (Feb. 21, 1966). In fact, respondent's own rulings hold that Michigan real property taxes accrue as of tax day for income tax purposes. See Rev. Rul. 39, 1953–1 C.B. 79. We believe they also accrue as of tax day for estate tax purposes.[15]

Respondent cites *Estate of Theresa Seagrist*, 42 B.T.A. 1159 (1940), for the proposition that real estate taxes do not accrue until the statutory lien date. *Seagrist* was decided under the tax laws of New York City which provided expressly that the day that taxes became "due and payable" and the day they became "liens" was the same. See also *Adda, Inc.*, 9 T.C. 199, 206–208 (1947), affd. 171 F. 2d 367 (C.A. 2, 1949). Here the statute explicitly provides that a debt exists with respect to the property before the date the lien attaches.[16] See *Harrington* v. *Hillard, supra.* Compare *City of Holland* v. *Township of Fillmore*, 363 Mich. 38, 108 N. W. 2d 840 (1961).

---

[15] This is so even though the tax rate is not fixed until the first Monday in June. See *Fawcus Machine Co.* v. *United States*, 282 U.S. 375 (1931) ; *H. H. Brown Co.*, 8 B.T.A. 112 (1927).

[16] The Board's decision in *Seagrist* was based on *Charles B. Shelton, et al.*, 3 B.T.A. 809 (1926) ; *Roy J. O'Neil, et al., Administrators*, 31 B.T.A. 727 (1934) ; *Milton H. Friend, et al., Trustees*, 40 B.T.A. 768 (1939) ; *M. P. Klyce, Administrator*, 41 B.T.A. 194 (1940), appeal dismissed (C.A. 5, Nov. 22, 1940) ; *Carter* v. *United States*, 3 F. Supp. 782 (E.D. Mo. 1932) ; and *Thompson* v. *United States*, 8 F. 2d 175 (D. Minn. 1925), all of which are distinguishable. In *Shelton, Friend, Carter,* and *Thompson,* the statutory lien for taxes attached prior to decedent's death and the courts held that the taxes had "accrued" or become claims against the decedent. In *O'Neil*, both the date the taxes became due and the date the statutory lien attached had passed prior to decedent's death and the Board said it was "immaterial" on which date the taxes had accrued since they both had passed. *Klyce* was decided on the basis of an Alabama Supreme Court decision that property taxes do not accrue until they become "due and payable." There was no lien involved.

We conclude therefore that the real property taxes accrued before decedent's death within the meaning of section 2053, and were properly deducted from the corpus of the estate.[17]

Effect will be given in the Rule 50 computation to petitioner's claim for further deductions with respect to additional attorneys' fees and expense incurred in connection with this deficiency, and to credit for Michigan estate and succession taxes actually paid.

*Decision will be entered under Rule 50.*

---

[17] Further support for our conclusion is derived from the history of Estate Tax Regs., sec. 20.2053–6(b), which suggests that a flexible test adaptable to the wide variations of State tax statutes was intended. The following sentence, included in the Notice of Proposed Rulemaking, Oct. 16, 1956, 21 Fed. Reg. 7850, 7889 (1956), was dropped from the final regulation: "Real property taxes are deductible only if they have become a lien on the real property before the decedent's death." Thus, under respondent's own regulation, it would appear that the lien date is not intended to be dispositive.