ESTATE OF NATHALIE F. BELL, DECEASED, GILBERT H. OSGOOD AND CHICAGO TITLE AND TRUST CO., EXECUTORS, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 7973-74.    Filed July 22, 1976.

---

*Rollin C. Huggins, Jr.,* and *Alan R. Brodie,* for the petitioners.
*Seymour I. Sherman,* for the respondent.

OPINION

FEATHERSTON, *Judge:* Respondent determined a deficiency of $31,609.69 in the Federal estate tax of the Estate of Nathalie F. Bell. Two issues are presented for decision:

(1) Whether the value of assets transferred by decedent to a trust of which she was a cotrustee are includable in her gross estate pursuant to section 2036(a)(2) [1] or 2038.

(2) If such assets are includable in decedent's gross estate, what was their fair market value as of August 24, 1971, the alternate valuation date elected pursuant to section 2032?

All the facts are stipulated.

Nathalie F. Bell (hereinafter decedent) died on February 24, 1971, a resident of the State of Illinois. Gilbert H. Osgood, a resident of Illinois, and the Chicago Title & Trust Co., whose principal place of business was in that State when the petition was filed, were appointed and, at all times pertinent to this proceeding, have served as the executors of decedent's estate. In such capacity, they timely filed the Federal estate tax return for decedent's estate with the District Director of Internal Revenue, Chicago, Ill., electing therein the alternate valuation date prescribed by section 2032.

Decedent was married to Laird Bell who died on October 21, 1965. On November 1, 1941, Laird Bell created a trust known as the Helen de Freitas Trust (hereinafter the trust) for the benefit of one of his and decedent's daughters. Decedent was named as a cotrustee of the trust, and she served in that capacity until the date of her death. The provisions of the trust instrument defining the powers of the trustees over the trust's income and corpus include the following:

---

[1] All section references are to the Internal Revenue Code of 1954, as in effect at the time of the decedent's death, unless otherwise noted.

## ARTICLE I

Section 1. During the life of the Grantor's daughter, Helen de Freitas, the Trustees shall pay to her the net income of the Trust Estate. The Trustees may, however, withhold so much of such income in any year as they do not believe to be necessary for her well-being and maintenance in health and comfort.

Section 2. * * *

(a) During the life of any daughter of the Grantor for whom a fund has been set aside, the Trustees shall pay to her the net income of such fund. The Trustees may, however, withhold so much of such income in any year as they do not believe to be necessary for her well-being and maintenance in health and comfort. * * *

* * *

Section 3. In addition to the power given to the Trustees in Section 1. (c) of Article II hereof, the Trustees may, in their sole discretion, at any time and from time to time during the life of the Grantor's daughter, Helen de Freitas, or after her death during the life of any other daughter of the Grantor for whom a fund has been set aside hereunder, distribute to such daughter, for the purpose of providing her with funds for a home, business, or for any other purpose believed by the Trustees to be for her benefit, all or any part of the principal of the Trust Estate or of the fund set aside for such daughter.

In November 1941, Laird Bell transferred to the trust 2,000 shares of stock in Weyerhaeuser Timber Co. (hereinafter Weyerhaeuser), and subsequently transferred to the trust another 2,400 shares of such stock. On December 30, 1950, the trust received 4,400 additional shares of Weyerhaeuser stock as the result of a 2-for-1 stock split payable to stockholders of record on December 1, 1950. Sometime after November 1, 1941, Laird Bell transferred to the trust 150 shares of stock in Chicago Title & Trust Co. (hereinafter C.T. & T.). On January 14, 1946, the trust received 600 additional C.T. & T. shares as the result of a 5-for-1 stock split. On December 26, 1950, decedent transferred by gift to the trust cash in the amount of $1,500 and a $5,000 United States Series C Treasury Note (hereinafter the note), bearing 1.25-percent interest and due July 1, 1951.

The total value of the corpus of the trust on December 26, 1950, when decedent made her transfers, was $666,384.11. Of such value, $659,884.11, or 99.02 percent, was attributable to transfers by Laird Bell, and $6,500, or 0.98 percent, being attributable to transfers by decedent, as follows:

*Value 12/26/50*

Transferred by or attributable to Laird Bell:

| | | Value 12/26/50 |
|---|---|---|
| 8,800 | shares Weyerhaeuser _____ | $536,800.00 |
| 100 | shares Montana Power _____ | 2,187.50 |
| 50 | shares Pfizer _____ | 3,993.75 |

| | | |
|---|---:|---:|
| 750 shares C.T. & T. | 37,687.50 | |
| | 580,668.75 | (87.13%) |
| Other securities and cash | 79,215.36 | (11.89%) |
| | 659,884.11 | |
| Transferred by decedent: | | |
| $5,000 note | 5,000.00 | (.75%) |
| Cash | 1,500.00 | (.23%) |
| Total | 666,384.11 | (100.00%) |

Laird Bell was the only person who made transfers to the trust before December 26, 1950. Decedent was the only person who made any transfers to the trust on that date, and no one made transfers to the trust thereafter.

The note transferred by decedent was exchanged for various other obligations of the United States, the last of which matured on November 15, 1965, when the $5,000 principal due on maturity was received by the trust. In addition, the trust received payments of interest from time to time on the note and the various other obligations for which it was exchanged.[2] On November 15, 1965, the maturity date of the $5,000 note, the proceeds thereof were equal to 0.22 percent of the value of the entire trust res, which consisted of the following:

| | | |
|---|---:|---:|
| Transferred by or attributable to assets | | |
| originally transferred by Laird Bell: | | |
| 35,200 shares Weyerhaeuser | $1,425,600.00 | |
| 880 shares Wood Conversion (spinoff | | |
| from Weyerhaeuser) | 6,710.00 | |
| 300 shares Montana Power | 11,531.25 | |
| 450 shares Pfizer | 30,346.88 | |
| 2,250 shares C.T. & T. | 87,750.00 | |
| 37 shares Pfizer (dividend | | |
| from C.T. & T.) | 2,495.19 | |
| | 1,564,433.32 | (69.68%) |
| Other securities and cash | 675,760.19 | (30.10%) |
| | 2,240,193.51 | |
| Note transferred by decedent | 5,000.00 | (.22%) |
| | 2,245,193.51 | (100.00%) |

---

[2] These interest payments were relatively nominal: $1\frac{1}{4}$ percent due July 1, 1951; $1\frac{7}{8}$ percent due Apr. 1, 1952; interest rates not specified for the periods ended Feb. 15, 1953, and Feb. 15, 1954; $2\frac{1}{2}$ percent due Nov. 15, 1961; $3\frac{3}{4}$ percent due May 15, 1964; and 4 percent due Nov. 15, 1965.

On the alternate valuation date of August 24, 1971, the following were securities held by the trust which were either transferred to the trust by Laird Bell, received in respect of securities transferred by him, purchased by the trust prior to December 26, 1950, or received in respect of securities so purchased:

| | | Value 8/24/71 |
|---|---|---|
| 58,600 | shares Weyerhaeuser | $3,102,137.50 |
| 880 | shares Conwed (spinoff from Weyerhaeuser) | 8,470.00 |
| 300 | shares Montana Power | 8,943.75 |
| 1,350 | shares Pfizer | 52,228.13 |
| 2,250 | shares Lincoln National preferred | 187,312.50 |
| 111 | shares Pfizer (dividend from C.T. & T.) | 4,294.31 |
| | | 3,363,386.19 |

On that date the trust held other securities and cash having a value of $813,906.92. The record does not show how much of the value of these other securities and cash was attributable to the $1,500 in cash and the $5,000 note decedent contributed to the trust on December 26, 1950. The amount of the August 24, 1971, value reasonably allocable to her contribution is the subject matter of the second issue.

The 58,600 shares of Weyerhaeuser stock and the 2,250 shares of Lincoln National preferred stock were derived from Laird Bell's contribution to the trust. The Lincoln National preferred stock was received in exchange for C.T. & T. stock. The trust never purchased any Weyerhaeuser, C.T. & T., or Lincoln National stock. The Weyerhaeuser stock and the Lincoln National preferred stock were all transferred to the trust by Laird Bell or resulted from stock splits or exchanges of stock transferred to the trust by Laird Bell. Decedent never transferred any Weyerhaeuser, C.T. & T., or Lincoln National stock to the trust nor was any cash or other property she transferred to the trust ever used to purchase such stocks.

Respondent determined that the value of that portion of the trust corpus attributable to decedent's inter vivos transfer to the trust was includable in her gross estate pursuant to sections 2036(a)(2) and 2038. To support his determination, respondent contends that the power held by decedent, as trustee, at her death constituted "the right * * * to designate the persons who shall possess or enjoy the property or the income therefrom" within

the meaning of section 2036(a)(2)[3] and "a power * * * to alter, amend, revoke, or terminate" the trust and thereby change the enjoyment of the transfer within the purview of section 2038(a)(1).[4]

Petitioner argues that the power held by decedent, although giving her a degree of control over the income and corpus of the trust, was subject to an ascertainable external standard, enforceable in an Illinois court of equity. As a result of this qualification of decedent's power, petitioner maintains, sections 2036(a)(2) and 2038 do not apply, and none of the trust res is includable in decedent's gross estate. We hold for respondent on this issue.

The trust indenture executed by Laird Bell enumerates the controversial powers of the trustees in the three separate paragraphs quoted above. In determining whether the exercise of these trust powers was subject to an external standard, the terms of the trust indenture must be examined in light of the State law—in the instant case, Illinois—that would control the interpretation and construction of the instrument. See, e.g., *Estate of Ralph Budd,* 49 T.C. 468, 474 (1968); *Estate of Marvin L. Pardee,* 49 T.C. 140, 144 (1967).

Pursuant to sections 1 and 2(a) of article I of the indenture, decedent was given certain income rights, but the trustees were given the power to "withhold so much of such income in any year as they do not believe to be necessary for her [beneficiary's] well-being and maintenance in health and comfort." Although

---

[3] SEC. 2036. TRANSFERS WITH RETAINED LIFE ESTATE.

(a) GENERAL RULE.—The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death—
* * *
(2) the right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property or the income therefrom.

[4] SEC. 2038. REVOCABLE TRANSFERS.

(a) IN GENERAL.—The value of the gross estate shall include the value of all property—

(1) TRANSFERS AFTER JUNE 22, 1936.—To the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, where the enjoyment thereof was subject at the date of his death to any change through the exercise of a power (in whatever capacity exercisable) by the decedent alone or by the decedent in conjunction with any other person (without regard to when or from what source the decedent acquired such power), to alter, amend, revoke, or terminate, or where any such power is relinquished in contemplation of decedent's death.

providing a modicum of discretion to the trustees, this language created a standard enforceable in a court of equity. Under Illinois law, a court of equity would look to the beneficiary's accustomed living standard in compelling compliance by the trustees, either to require income distributions for the stated purposes or to restrain distributions for unauthorized purposes. *In Re Whitman,* 22 Ill. 511 (1859) ("support, education and maintenance"); *French v. Northern Trust Co.,* 197 Ill. 30, 64 N.E. 105, 106 (1902) ("properly maintained and comfortably provided for out of such property"); *Burke v. Burke,* 259 Ill. 262, 102 N.E. 293, 294 (1913) ("the comforts and necessities of life"). Such powers are not sufficient to cause the inclusion in decedent's gross estate of the value of the transfers here in dispute. *Jennings v. Smith,* 161 F.2d 74 (2d Cir. 1947).[5]

However, section 3 of article I of the indenture gave the trustees additional powers, allowing them to invade the corpus of the trust "for the purpose of providing * * * [a beneficiary] with funds for a home, business, or for any other purpose believed by the Trustees to be for * * * [a beneficiary's] benefit." This section does not prescribe an objective standard to govern the trustees in making distributions of corpus.

While the provision of funds for a "home" might be read to be limited to a home similar to the one customarily occupied by the beneficiary, there is no similar standard for gauging the amount of funds to be distributed for a "business." Nothing in the instrument gave any guidance to the trustees as to the kind, nature, or magnitude of the business for which funds could be distributed. The trustees thus had unlimited discretion to decide whether all or none of the corpus would be used to finance the beneficiary's business endeavors.

Moreover, the provision giving the trustees power to make distributions "for any other purpose believed by the Trustees to be for her [a beneficiary's] benefit" is as "wide as the world and to say that it imposes a legal limitation * * * is to stretch it far beyond good sense." *Hurd v. Commissioner,* 160 F.2d 610, 612-613 (1st Cir. 1947), affg. 6 T.C. 819 (1946) (trustees

---

[5] In *Jennings v. Smith,* 161 F.2d 74, 78-79 (2d Cir. 1947), the court said:

"A 'right' so qualified that it becomes a duty enforcible in a court of equity on petition by the beneficiaries does not circumvent the obvious purpose of section 811(c) [the predecessor of sec. 2036] to prevent transfers akin to testamentary dispositions from escaping taxation."

empowered to invade corpus "if in their opinion the circumstances require"). Certainly, the term "benefit," standing alone, does not establish an objective standard. See, e.g., *Dorothy Stuit,* 54 T.C. 580, 583 (1970), affd. 452 F.2d 190 (7th Cir. 1971). Nor can it be said that the term "benefit" was sufficiently circumscribed by the other enumerated purposes for which funds could be distributed under the terms of the trust, i.e., for "home" or "business." Cf., e.g., *Estate of Marvin L. Pardee, supra* at 144. The specified purposes of providing a "home" and "business" are so distinctive and unrelated one to the other that they provide no clue as to the other purposes the grantor had in mind by his use of "benefit." We conclude that such unbridled discretion to distribute the trust corpus requires a holding for respondent on this issue under section 2038(a)(1).[6]

There remains the question as to the value of the portion of the trust res includable in decedent's gross estate. Respondent contends that 0.98 percent ($40,937.47) of the value of the corpus as of the alternate valuation date of August 24, 1971, is includable. Respondent reasons that decedent's transfer of the note and cash amounted to that percentage of the value of the trust corpus as of December 26, 1950, and, consequently, the same percentage should be applied in calculating the amount of the inclusion.[7]

The objective of section 2038 is to include in a decedent's gross estate the value of transferred property over which the decedent has retained a prohibited degree of control.[8] Where property so transferred by the several grantors of a trust is commingled with

---

[6] We express no opinion as to whether the transferred property is also includable under sec. 2036(a)(2) or, since the issue has not been raised, whether the inclusion under sec. 2038(a)(1) is limited to the value of the remainder interest of Helen de Freitas. See sec. 20.2036-1(b)(3), Estate Tax Regs.; compare *Walter v. United States,* 341 F.2d 182, 186 (6th Cir. 1965), with *In Re Inman's Estate,* 203 F.2d 679 (2d Cir. 1953); see also Lowndes, Kramer & McCord, Federal Estate and Gift Taxes, secs. 8.13 and 9.20 (3d ed. 1974).

[7] The inequity in respondent's position is demonstrated by the dramatic increase in the value of the Weyerhaeuser shares from $536,800 to $3,102,137.50 between Dec. 26, 1950, and Aug. 24, 1971, and the value of the C.T. & T. stock (exchanged for Lincoln National stock) from $37,687.50 to $187,312.50 during the same period. In addition, some of the other stocks on hand on Aug. 24, 1971, were received as dividends on these stocks. It is stipulated that "Nathalie F. Bell never transferred any Weyerhaeuser, Chicago Title and Trust or Lincoln National stock to the Trust nor was any cash or other property she transferred to the Trust ever used to purchase such stocks." Indeed, the note, representing $5,000 of the $6,500 contributed by decedent on Dec. 26, 1950, remained in the form of a Treasury security, bearing nominal interest until Nov. 15, 1965.

[8] This would include all earnings accumulated from transferred property as well as the interest earned on the note prior to its conversion to cash. *United States v. O'Malley,* 383 U.S. 627, 632-633 (1966).

other property and cannot be identified, the formula advocated by respondent may have merit. See *Estate of Miran Karagheusian,* 23 T.C. 806, 812-813 (1955), revd. on other grounds 233 F.2d 197 (2d Cir. 1956). See also *Estate of James L. Thomson,* 58 T.C. 880, 890-891 (1972), affd. 495 F.2d 246 (2d Cir. 1974). If specific property transferred by a decedent is capable of identification, however, the value of such specific property should be included in the gross estate. *Estate of Anna Hart Kinney,* 39 T.C. 728, 733-734 (1963). Conversely, where someone other than the decedent has transferred specific assets to a trust which can be identified or traced, it is only reasonable that their value should be excluded in making the required allocations.

In a foregoing table, we have listed securities which, it is stipulated, "were either transferred to the Trust by Laird Bell, received in respect of securities so transferred by him, purchased by the Trust prior to December 26, 1950, or received in respect of securities so purchased," having a value of $3,363,386.19 as of August 24, 1971. Under the principle of *Estate of Anna Hart Kinney, supra,* those securities should not be taken into account in determining the amount includable in decedent's gross estate. The parties have agreed that:

If the Court determines that the amount includible shall be computed without taking into account trust assets still on hand which were transferred by Laird Bell, or deemed attributable to transfers by Laird Bell, the amount of the Trust *res,* at the alternate valuation date, so includible shall be $13,636.28.

Accordingly, we hold that $13,636.28 is the amount includable in decedent's gross estate under section 2038(a)(1).

To reflect the foregoing,

*Decision will be entered under Rule 155.*